410 So.2d 1105 (1982)
Mickey JOHNSTON
v.
Sandra McCULLOUGH.
No. 81-C-2172.
Supreme Court of Louisiana.
March 1, 1982.
*1106 John Makar, Natchitoches, for defendant-applicant.
James R. Hatch, Homer, for plaintiff-respondent.
DIXON, Chief Justice.
This is a custody proceeding to change custody of a thirteen year old boy brought seven years after the initial custody decree. The trial court ordered custody transferred to the father largely on the basis of the boy's expressed preference. The court of appeal affirmed, amending the ruling to grant greater visitation rights to the mother. 401 So.2d 509 (La.App.1981). Certiorari was granted to consider the correctness of this decision.
Sandra Johnston McCullough and Mickey Johnston were divorced on March 26, 1973, in an uncontested Arkansas proceeding. Custody of their five year old son, Kelly, was awarded to the mother. Shortly thereafter, Mrs. Johnston remarried and moved to Florida where the couple currently resides with Kelly. Mr. Johnston also remarried and lives in Homer, Louisiana with his new wife and her five year old daughter. Mr. Johnston paid $150.00 monthly under the divorce decree until the parties agreed that the amount should be raised to $200.00 per month due to private school tuition. No visitation privileges for Mr. Johnston were contained in the divorce decree. However, the mother allowed Kelly to spend about two months each summer and every Christmas vacation with his father in Louisiana. The record reveals, as the trial court found, that both environments are suitable, that each parent loves Kelly and keeps his best interests in mind.
The father maintains that he instituted this suit solely because of repeated requests by Kelly to live with his father in Homer. Both lower courts concluded a change of custody was appropriate since Kelly wanted to try living with his father. In reaching that decision, the trial court afforded much weight to the recommendation of a Reverend Donald Heacock that custody should be given to the father. Reverend Heacock, an ordained Episcopal minister and a clinical social worker hired by Mr. Johnston, spent a great deal of time with Kelly in order to ascertain Kelly's "true feelings" and whether his father was "manipulating him or encouraging him with bait of some kind." He observed that Kelly is mature for his age and stable, yet he gets upset a little more quickly than other people in his age group. In his opinion, Kelly enjoyed the rural environment in Louisiana where he was allowed freedom to move about the community at will, to participate in school sports, and to have responsibility caring for animals. Although Kelly exhibited love for his mother and stepfather, Reverend Heacock was of the opinion that forcing Kelly *1107 to remain with his mother against his will might foster a permanent resentment toward her. Reverend Heacock noticed tension between Kelly and his mother due to her attempts to persuade him to stay in Florida and his conflicting desire to live in Louisiana with his father. However, Reverend Heacock did not interview Mrs. McCullough or Mr. McCullough.
Due to the closeness in age between Kelly and his young stepmother (twenty-seven years old and married to Mr. Johnston for two years at the time of the trial) Reverend Heacock estimated that an adjustment period of at least two years would be necessary; the tension between Kelly and Mrs. Johnston could only be handled through counseling. The stepmother did not testify. Kelly himself testified that he and his stepmother had had some problems with discipline. No tension exists between Kelly and his stepfather. Kelly calls his stepfather "dad," they play and swim together, and a healthy relationship has grown between Kelly and Mr. McCullough during the years. Mr. McCullough often assists Kelly with his homework. No adjustment period would be required to create a relaxed atmosphere with Kelly's mother and stepfather; Kelly has lived with them and has been a part of that family unit for seven years.
Kelly had difficulty in school, beginning in the primary grades. An early examination indicated that he had dyslexia. He spent one year in a special school, showed improvement, and was returned to a regular school population. Almost every year he was tutored in addition to his regular classes and parental assistance. Recent records and testimony of Heacock and teachers show that Kelly has probably outgrown this handicap, but he continues to be only an "average" student, with the aid of tutoring.
The trial judge was in error when he found that the record "indicated that he did not suffer dyslexia; thus, it appears that his problem was something else."
The trial court had "the distinct impression that Mrs. McCullough was unduly overprotective of Kelly and nervously provocative about potential hurt to him via normal boyhood activities and attitudes."[1] The evidence does not support such a finding. The record does reveal a troublesome attitude on the part of Kelly's father. Mr. Johnston has given Kelly many expensive gifts and privileges which an average thirteen year old does not enjoy. For example, he has had two color television sets, a minibike, motorcycle, private telephone, horse and a shotgun. Some of these gifts were given to Kelly the summer before this suit was filed. Kelly has been allowed to drive an automobile by himself even though he is legally not old enough to operate a vehicle. He is permitted to stay up later at his father's home, whereas he was required to retire at 9:00 p. m. in Florida because staying up later affected his alertness in school.
Subsequent to Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (La.1971), the legislature amended C.C. 157; it now reads in part:
"In all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the husband or the wife, or to both jointly by agreement of both the husband and wife, in accordance with the best interest of the child or children; ... No preference shall be given on the basis of the sex of the parent in cases where custody is awarded to only one parent...."[2]
Stability and continuity must be considered in determining what is in the *1108 best interests of the child. In Bordelon v. Bordelon, 390 So.2d 1325 (La.1980), a protracted child custody battle persisted between the divorced parents which originated when the mother, the custodial parent, allowed a man to live with her and the children. Upon proof of this relationship, custody was changed to the father. The mother later sought a return of custody urging that she had remarried and her life was stable. This court upheld the lower court's award of custody to the mother, noting:
"... the stability factor weighs heavily in favor of the mother, since she was the parent most intimately involved with raising the child and had only lost custody for a short while in comparison to the child's age." 390 So.2d at 1329.
Although the lower courts were cognizant of this element, inadequate emphasis was placed upon the stability factor. The record shows that Kelly has lived with his mother and stepfather without adverse incident for seven years and that they have been loving parents. The results of their careful attention are apparent in Kelly's school record and development. No reason to change custody is discoverable except the wishes of Kelly and his father.
"... even though there is no longer an inflexible rule with regard to changes of custody, the policy consideration underlying the rule, stability of environment, is still relevant to a determination of the best interest of the child. A court should consider the prior history of the child's custody when asked to change custody. Generally, it might not be in the best interest of a child to be regularly moved from parent to parent...." 390 So.2d at 1329.
In Cleeton v. Cleeton, 383 So.2d 1231 (La.1980), a change of custody was sought because the mother, who had custody of three minor daughters, was conducting an adulterous relationship. The man whom Mrs. Cleeton was seeing occasionally stayed overnight at the family home, although he generally departed before the girls awoke. This court declined to change custody largely because the children were accustomed to their mother's care and such action would be traumatic. A change of custody after seven years in a stable, loving environment to a home where adjustment problems are predicted might have long-term detrimental consequences. While it is understandable that Kelly, approaching manhood, wants to spend more time with his father, it is in the best interest of Kelly that the custody arrangement be left undisturbed.
Therefore, the judgment of the lower courts is reversed; since there were no visitation privileges in the original custody decree, it is amended to grant plaintiff, Mickey Johnston, the right of reasonable visitation with Kelly. The plaintiff is cast with all costs.
NOTES
[1] The only support for this conclusion is the testimony of Ron Young, a close friend of the McCulloughs. Although his testimony taken as a whole illustrates the closeness between Kelly and his mother and stepfather, Mr. Young stated that Mrs. McCullough was "almost too concerned sometimes ... almost being a little bit overprotective."
[2] In 1977, C.C. 157 was amended to incorporate the "best interests of the child" test. A later amendment in 1979 specifically applied C.C. 157 to changes of custody as well as the initial custody determination.