451 So.2d 1187 (1984)
Terry Watts PRICE
v.
Morris Mathis PRICE.
No. CA 83 1424.
Court of Appeal of Louisiana, First Circuit.
May 30, 1984.
*1188 Charles W. Rea, Baton Rouge, for plaintiff-appellant.
Alan S. Fishbein, Baton Rouge, for defendant-appellee.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
This action commenced as a rule by a husband alleging that his divorced wife was in contempt of court for violating the terms of a judgment awarding visitation rights and a rule to change the permanent custody of their two minor children from the wife to him. (One child was the wife's by a prior marriage and was adopted by the husband.) The husband also sought an attorney fee award. The paternal grandmother of the oldest child intervened seeking specific visitation rights. The trial court entered an interim order giving the husband and wife joint custody of the children and giving the grandmother visitation of one day per month. Subsequently, judgment was rendered as follows:
(1) the interim joint custody order was vacated;
(2) the husband was awarded custody of the youngest child, subject to specific visitation rights of the wife;
(3) the wife was granted custody of the oldest child, subject to specific visitation rights by the husband;
(4) the child support award in favor of the wife was vacated;
(5) the contempt rule and the claim for an attorney fee were dismissed; and
(6) specific visitation rights were given to the paternal grandmother of the oldest child.
This devolutive appeal was taken by the wife contesting the change of custody of the youngest child.

FACTS
Terry Watts (wife) and David Deshler, Jr. were married in April of 1974. Deshler was killed in a motorcycle accident on February 4, 1975. Keri Lynn Deshler (oldest child) was born of the Watts-Deshler marriage on July 14, 1975.
On June 27, 1977, the wife married Morris Mathis Price (husband). The husband subsequently adopted the oldest child. Kelvin Robert Price was born of the Watts-Price marriage.[1]
The husband and wife physically separated in November of 1981 and were judicially separated on March 9, 1982. On December 10, 1982, the wife obtained a judgment of divorce. That judgment awarded her the custody of the two children and $215 per month for child support. The husband was granted specific visitation rights.
These rules were filed on December 27, 1982. After extended proceedings (including professional counseling), the judgment *1189 complained of was rendered on September 14, 1983.
Sometime after December 10, 1982, the wife married Dwayne Spurgeon.

CHANGE OF CHILD CUSTODY
The wife contends the judgment of the Family Court awarding the custody of Kelvin to the husband was wrong and not in Kelvin's best interest because it separates him from his sister, removes him from a happy, well-adjusted home and disregards the testimony of the wife's retained psychologist. The wife also contends that this judgment is an improper tool to regulate Keri's refusal to visit with the husband.
In Everett v. Everett, 433 So.2d 705, 708 (La.1983) appears the following:
The best interest of the child is the sole criterion in a change of custody case. La.Civ.Code arts. 157 A and 146 E; Bordelon v. Bordelon, 390 So.2d 1325 (La.1980). Stability and continuity must be considered in determining what is in the best interest of the child. Johnston v. McCullough, 410 So.2d 1105 (La.1982); Bordelon v. Bordelon, supra. Upon appellate review, the determination of the trial judge is entitled to great weight and will not be disturbed unless a clear showing of abuse of discretion is made. Bordelon v. Bordelon, supra. Custody should not be changed when to do so would punish a parent for past behavior when there is no proof of a detrimental effect on the child or children. Cleeton v. Cleeton, 383 So.2d 1231, 1235 (La. 1980) (on rehearing).
See also Steagall v. Steagall, 442 So.2d 732 (La.App. 1st Cir.1983). In Bagents v. Bagents, 419 So.2d 460, 462-463 (La.1982) appears the following:
In performing its function of deciding custody cases, the trial court is vested with a vast amount of discretion. On appellate review, great deference must be accorded to the decision of the trial court, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
The decision reached by the trial court in this case is not necessarily the decision that the individual judges of this court would have reached. Nevertheless, this court's function is not to substitute its collective decision for that of the trial court, but to review the decision for error of law.
La.C.C. art. 146(C) provides in pertinent part as follows:
C. There shall be a rebuttable presumption that joint custody is in the best interest of a minor child.
. . . . .
(2) The presumption in favor of joint custody may be rebutted by a showing that it is not in the best interest of the child, after consideration of evidence introduced with respect to all of the following factors:
(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be *1190 of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute.
The record reflects that the husband and wife both love and care for Kelvin. La. C.C. art. 146(C)(2)(a). The capacity and disposition of the parties to give Kelvin love, affection and guidance, to continue his education and raising in his religion and to provide him with food, clothing, medical care and other material needs were not placed at issue. La.C.C. art. 146(C)(2)(b) and (c). There is no evidence to show that the parties are morally unfit or that they lack the mental and physical health to raise a child. La.C.C. art. 146(C)(2)(f) and (g). The record does not reflect Kelvin's school or community record, nor does it show the distance between the residences of the parties. La.C.C. art. 146(C)(2)(h) and (k). Except as indicated herein below, the record does not reflect that Kelvin had a reasonable preference for one parent over the other. La.C.C. art. 146(C)(2)(i).
Apparently, Kelvin lived with his father and mother from the time of his birth until their separation in November of 1981. After this separation, Kelvin remained in his mother's custody and was visited on a regular basis by his father. Kelvin lived with his mother and Dwayne Spurgeon from the time of their marriage until the contested judgment rendered on September 14, 1983. La.C.C. art. 146(C)(2)(d).
The husband has remained single and works shift work. He has his own home, and his parents live next door. His father is retired, and his mother is semiretired. His father, mother and sister-in-law are available to help him with Kelvin. The husband cooks, does laundry and in the past has read books to the children. A school bus passes right in front of his house. La.C.C. art. 146(C)(2)(e).
When the wife had custody of both children, the husband went to get them for almost every scheduled visitation. Kelvin usually ran out into his father's arms, but Keri usually refused to go for the visit. When the husband went for his scheduled Christmas visit in 1982, he was confronted by Spurgeon and told in essence that the only way he would visit with the children was over Spurgeon's dead body. That confrontation apparently provoked the instant rules for contempt and change of custody.
Between November of 1982 and February of 1983, the wife, Spurgeon and the two children consulted with Dr. Margaret Pereboom, a child psychologist retained by the wife. During this period, Dr. Pereboom saw Keri eight times, Kelvin five times and the wife nine times. Dr. Pereboom found that Keri had a healthy personality except for a strong, long-standing animosity toward the husband. Keri had a protective (sometimes overprotective) attitude about Kelvin. Keri vigorously opposed visiting with the husband and did not want Kelvin to do so either. Dr. Pereboom felt that Kelvin loved the husband and wanted to be with him. After February of 1983, Dr. Pereboom saw the wife and the children on five occasions. Keri's attitude toward the husband remained hostile. Kelvin was beginning to echo this hostility. Dr. Pereboom felt that Keri was convinced of the righteousness of her position and that she was the aggrieved party. Dr. Pereboom felt that the husband needed to "woo" Keri and convince her that he loved her and wanted her. Dr. Pereboom acknowledged that Keri wanted to be adopted by Spurgeon. She felt that if the parties did not cooperate reconciliation between the husband and Keri would not be achieved. Although Kelvin had positive feelings about the husband in March of 1983, in August of 1983 he refused to go on a visit with Price. She also felt that the wife needed to be more forceful in urging Keri to go on visitations. Dr. Pereboom was of the opinion that the custody of the *1191 children should remain with the wife and should not be given to the husband.
Phyllis LeFeaux, a family counselor and child welfare worker, began seeing the parties on March 24, 1983, on instructions from the court. She saw the wife twelve times, the husband ten times, Keri two times and Kelvin two times. She found Keri to be a strong-willed child with definite opinions. She felt that Keri viewed the husband's involvement with the family as a threat. During the course of her evaluation of the family, not much improvement was made about the visitation problem with Keri. LeFeaux was advised that when the husband came for a visitation Keri got upset, angry, tearful, verbally abusive and sometimes ran into her room. Recently, Kelvin had been reluctant to visit Price and caused difficulty when staying with him. If the present situation continued, it would become increasingly difficult to get Kelvin to visit with the husband. She felt that the children should not be isolated from either parent and that the children needed both of their parents. She felt that the husband loved both of his children, and she knew of no professional reason why he should not have visitation or custody.
The evidence indicates that the wife lacked the ability to facilitate and encourage a close and continuing parent-child relationship between Keri and the husband. La.C.C. art. 146(C)(2)(j). Although she had custody of Keri and professed to try to improve the situation, it is apparent that her efforts were unsuccessful and ultimately resulted in Keri's hostility being echoed by Kelvin. Although the record indicates that the husband was not as affectionate toward Keri as he was toward Kelvin, he dutifully attempted to keep scheduled visitations with the children. Despite repeated court intervention, psychological evaluation and family counseling, the relationship between Keri and the husband did not improve and that between Kelvin and his father deteriorated. As indicated by the court designated family counselor, if that situation were allowed to continue it would become increasingly difficult to get Kelvin to visit with his father. This could ultimately lead to the destruction of that parent-child relationship.
The deterioration and/or destruction of the relationship between Kelvin and his father is detrimental to Kelvin. Although the separation of children of a family is a custodial disposition which courts should avoid, sometimes it is necessary and in the best interest of the child. Wallace v. Wallace, 420 So.2d 1326 (La.App. 3rd Cir. 1982). The evidence indicates that had the family court judge maintained the status quo, the relationship between the husband and Kelvin would have continued to deteriorate. The only practical alternative available to preserve the father-son relationship was to remove Kelvin from the environment that spawned the problem and place him with his father, subject to reasonable specific visitation privileges granted to his mother.
After considering all of the evidence of record and the pertinent factors established by law, we cannot say that the family court judge abused the great discretion accorded him by law. Cf. Bezou v. Bezou, 436 So.2d 592 (La.App. 4th Cir.1983), writ granted, 437 So.2d 285 (La.1983).

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed at the appellant's costs.
AFFIRMED.
NOTES
[1] The record does not reflect Kelvin's date of birth.