545 So.2d 1279 (1989)
Sally Ann Layman LUNSFORD, Plaintiff-Appellant,
v.
Glenn Travler LUNSFORD, Defendant-Appellee.
No. 20570-CA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 1989.
Edna L. Caruso, P.S., West Palm Beach, Fla., Love, Rigby, Dehan, Love & McDaniel by Hani E. Dehan, Shreveport, for appellant.
Ronald J. Miciotto, Shreveport, for appellee.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
MARVIN, Judge.
In this post-divorce action brought by the father to change a considered decree of joint custody, the mother appeals the judgment awarding sole custody to the father.
The mother contends the father did not prove, as he must under Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), that the changes in the parents' circumstances after the joint custody decree materially affected the welfare of the children.
We reverse, finding on review that the evidence was not legally sufficient to warrant the change to sole custody.

FACTS
In 1986, each spouse sought a legal separation and sole custody of three children who were then ages nine, six and two. When the custody rule was heard in May 1986, the father, an Air Force pilot stationed at Barksdale Air Force Base in Bossier City, was often on flight duty away from home for extended periods of time. He then planned to hire someone to care for the children in his absence, contending *1280 it would not be in the children's best interest to live with their mother because her fundamentalist religious beliefs and her relationship with a female friend were "confusing" to the children.
In its reasons for judgment dated July 25, 1986, the trial court stated:
The psychologist appointed by the Court to examine the parties recommended in their (sic) report that the domiciliary parent be the mother with liberal visitation to the father. The Court would agree with one conclusion drawn by the psychologist, and that is that both parties basically desire the best interest of the children [to] be fulfilled, both having interest and concern for the children.
[A]lthough the mother's religious beliefs may be fundamental, that in itself is not sufficient under the law to establish that it is in the best interest of the children to reside with the father.... Although the husband indicated that the children were confused because of these fundamentalist beliefs, the Court is more impressed with the children's confusion being based on the mother and father's separation itself. The court-appointed psychologist did indicate that although there was evidence of confusion and pressure as a result of this home breakup, the children were doing fine under the circumstances.
The husband's plan although well-intended is unrealistic. The supplanting of the mother under these circumstances with a "Nanny" to take care of the children when he might be absent for extended periods of time would not be in the children's best interest.
Addressing the evidence that the mother's female friend was in the mother's home daily, doing family and household chores, and often spent the night there, sleeping in the same bed with the mother, the court found:
[S]uch activity over a protracted period of time would lead to confusion in the children's minds. The constant daily attendance of the friend in the household doing family and household chores also tends to lend itself to confusion and subsequent over-dependence of the mother on this individual for the household activities. The Court finds that such overnight activity will not be allowed while the children are in the household. The Court feels strongly that it will be in the best interest of the children that the friendship be regulated on a more normal non-daily basis. That the assistance which the friend has been tendering is to be tempered so that the household be dependent upon itself and not on an outside source. Social activities and visits will of course be considered a normal and proper activity. (Our emphasis.)
In a January 13, 1987, judgment, the court awarded joint custody, named the mother as the domiciliary parent, and granted the father custody every other weekend, one night per week, six weeks in the summer, and on alternating holidays. Neither party appealed.
At the father's request in his petition for divorce, joint custody was continued in an April 1987 divorce judgment. Shortly after the divorce, the father remarried. He and his second wife moved from Louisiana to Virginia in September 1987, when he was assigned to duty at the Pentagon.
In November 1987, the father petitioned for sole custody, alleging that his circumstances had changed because he had remarried and had regular work hours with no flight duty. He also alleged that the mother's female friend disciplined the children on a regular basis and continued to have daily contact with them in violation of the court's order.
At the custody hearing on May 6, 1988, the father testified that he is not on call as a pilot but works at the Pentagon from 8:00 a.m. to 5:00 p.m. Monday through Friday, and can routinely spend time with his children. He expects to be stationed in Washington, D.C. for at least three more years. He described "excellent" schools and cultural opportunities for the children in the area. He lives in a four-bedroom rental home with his wife and her five-year-old son by a previous marriage. His wife works full time managing a dentist's office. She testified she would reduce her *1281 work hours during the school year and stop working during the summer if her
stepchildren lived with their father. The father's children were shown to have a good relationship with their stepmother and stepbrother.
The mother lives in a three-bedroom apartment in Shreveport and works full time at a local bank. She was not working at the time of the previous custody hearing. She takes the three-year-old child, Sandy, to a day care center before she goes to work at 8:00 a.m. Eight-year-old David and 11-year-old Laura ride the school bus to school in the morning and to the day care center after school ends at 3:00 p.m. Each day, except Friday, the mother obtains the children at the day care center after she leaves work at 4:30 p.m. The center closes at 6:00 p.m. Because the mother is required to work until 6:00 p.m. on Friday, she has someone else, usually a babysitter, pick up the children shortly before 6:00 and stay with them until she gets home from work at about 6:15.
The mother described her relationship with her friend Mary:
My relationship to her is that she would be considered right now my best friend but she is just a friend. She has been a very big blessing to me because I needed help when I first was going through this [the divorce]. But in that I feel it is fair to state that our relationship was quite a daily help type of thing when this first started. It is not that way right now.
The mother admitted that Mary had bought groceries for her five times in the past year and occasionally washed a load of laundry for her at Mary's house because the mother does not have a washing machine or dryer in the apartment. The mother testified that she does all other household chores herself, including washing clothes and dishes, ironing, and making lunches for the children.
Mary stayed in the mother's apartment overnight on January 23, 1988, when the children spent the night with their father while he was in Shreveport for a visit. On one other occasion, Mary came to the mother's apartment after the children went to bed and stayed until about 3:00 a.m. The mother testified that an ice storm occurred after Mary arrived and delayed her departure. Mary decided to depart before the weather conditions improved because she and the mother were aware of the trial court's order that she not stay overnight when the children were present.
The mother testified that Mary is her friend but is not her lover. Agreeing, the father does not consider the mother's relationship with Mary to be immoral, but objects to it only because of Mary's "influence" on the children. He described the relationship of David and Laura with their mother as "strained" and said they have repeatedly told him that they dislike Mary. The father, mother and stepmother testified that the children have expressed a desire to live with their father.
Dr. Gerald Baker, a psychologist who evaluated David and Laura at the father's request and saw them three times shortly before the hearing, testified:
The children, you know, care about both their parents. I don't think there is any problem in that regard....
I think that certainly the turmoil of having gone through the divorce and the post-divorce adjustment, there's been some difficulties, I think, as mentioned with this woman Mary.... They don't have any decidedly negative feelings towards the mother, but there wasn't the same level of excitement about staying with the mother as it was with the possibility of them moving with the father....
[Laura] has expressed some difficulties in relating to her mother, concerns about sharing a room with her sister.... She felt like that was a little intrusive for her. Of course, she was drawing the comparisons between the apartment lifestyle and the home that her father presently has [where she would have a bedroom to herself]....
David did seem distressed ... about his interactions with this woman Mary who he said had grabbed him by his shirt and held him up by his shirt. He was very much opposed to his contact with her.
*1282 The mother testified that Mary grabbed David by the arm one time, when Mary took the children to her parents' lake house and David disobeyed Mary's instructions not to walk on the carpet in the house with mud on his shoes. David told Dr. Baker he felt that Mary was "intruding in his life [and] trying to be the `father' in his home." Laura did not mention Mary to Dr. Baker.
Dr. Baker described both children as withdrawn and insecure. He recommended that they receive counseling, no matter which parent they lived with. He did not evaluate the parents or the youngest child, nor did he express an opinion about whether the joint custody arrangement should be changed.
The psychologist appointed by the court to evaluate the parties before the 1986 custody hearing was apparently not asked to evaluate them again.

TRIAL COURT FINDINGS
The trial court found that the mother had made only a "perfunctory attempt" to change her relationship with Mary and that Mary had continued her "abnormal interjecting into the household."
The Court feels that the relationship between the mother and this woman is continuing to be confusing to the children. The children are developing resentment with regard to this relationship. This is not a normal household relationship for these children to live in.
... When the court compares this household atmosphere with the father's, the age of the children, and the fact that he offers the children a husband and wife relationship in a community that provides equal schools and equal or better living standards, it is convinced that it would be in the best interest of the children that the children's custody be changed. There has been a sufficient change in condition as far as the husband is concerned and not only a lack of positive change, but rather a negative continuation in negative relationships by the mother to warrant that the children be awarded to the father subject to visitation at reasonable times and places with the mother.

BURDEN OF PROOF
Bergeron v. Bergeron, supra, states and explains the burden of proof imposed on a party seeking to change a custody order:
Although the trial court retains a continuing power to modify a child custody order, there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a significant change in the custody order....
In the change of custody context, there is more at stake than simply selecting the best of the initial custodianships proposed. The harm which may result from disrupting the child's established mode of living and the injury that may result from the encouragement of unjustified litigation and continued parental conflict... are relevant in custody change cases....
When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. 492 So.2d at 1194, 1200, 1202.
The father contends Bergeron does not apply because the joint custody order was conditioned on the mother's curtailment of her relationship with Mary and a conditional custody order is not deemed to be a "considered decree." He cites Thomas v. Thomas, 519 So.2d 357 (La.App. 2d Cir. 1988), to support this argument.
In Thomas, the judgment awarding sole custody to the father expressly required the father to abstain from using marijuana and to undergo periodic drug testing. The father thereafter submitted to drug tests that screened for several controlled substances other than marijuana, and produced evidence of negative test results when *1283 the child's maternal grandparents sought to have the child removed from her father's custody. Because the father's use of marijuana was the primary concern voiced by the trial judge in requiring the father to be tested, and the father had not complied with the true nature of the drug testing order, this court concluded that the "conditional decree made with the reservations of the trial judge with which the [father] failed to comply does not invoke the change of circumstances rule required for modification of an unconditional decree of permanent custody." 519 So.2d at 360.
Here, the joint custody judgment awarding primary residential custody to the mother did not expressly condition the award on the mother's curtailment of her relationship with Mary, although the trial court's written reasons for judgment admonished the mother to discontinue Mary's overnight visits when the children were present and to become more self-reliant as the head of the household.
In any event, and even if the joint custody judgment is deemed conditional, this record does not support the trial court's finding that the mother violated the order concerning her relationship with Mary, nor does it show that the limited contact she continued to have with Mary was detrimental to the children.
Even under the "best interest of the child" standard that applies when the custody order sought to be changed is not a "considered decree," the violation of a court order by the custodial parent is not a sufficient reason to change custody absent a showing of a detrimental effect on the child. Everett v. Everett, 433 So.2d 705 (La.1983).

MOTHER'S CONDUCT
The trial court's conclusion that the mother made only a "perfunctory attempt" to change her relationship with Mary is not based on factual findings or inferences that are supported by the record.
The trial court found that the mother "saw the friend daily, that the friend was by the house on an almost daily basis, that the friend continued to buy groceries for the household and came to do various household chores."
The mother testified that she and Mary's mother work in the same bank and that she may see Mary "for a small amount of time maybe every day ... She may come into the bank and talk to her mother. I may see her but I don't necessarily spend time with her ... She might come over [to the apartment] a couple of times in the week, two or three maybe ... includ[ing] the weekends." The mother acknowledged that Mary shopped for groceries for her five times in the past year and occasionally took a load of laundry from the mother's home to her own home to wash it. The mother testified that she personally performed all other household chores. This record does not support the conclusion that Mary "continued" to perform household chores in the mother's home, as the trial court found, or otherwise violated the court's 1986 admonition.
Concerning Mary's presence in the mother's home during the night because of an ice storm, the court found:
The testimony of the mother that Mary came over to check on the family during the icy conditions, something that could have been accomplished by a mere phone call, is further evidence of her abnormal interjecting into the household situation....
It was testified that [Mary] left early the morning in question. Testimony was contradictory as to what transpired. The Court is convinced that [Mary] did come over and did stay an extended period of time through the night. The mother testified that [Mary] left right before the children woke up the next morning.
The mother was the only witness who testified about this visit. She did not say that Mary came to check on the family "during the icy conditions," as the trial court found. She testified that Mary was on her way home from some other activity that evening and stopped by "to see how we were doing" and did not learn that the bridge was closed until after she arrived. The mother consistently stated that Mary *1284 left around 3:00 a.m. and that the children did not wake up before 6:00 a.m. This record does not show, as the trial court found, that the testimony was "contradictory" or that Mary left "right before the children woke up."
The court previously required the mother to curtail her relationship with Mary when the children were present but did not require her to end the relationship, expressly stating that "social activities and visits will of course be considered a normal and proper activity." That Mary sometimes visited the mother after the children were asleep shows compliance with, rather than violation of, the court-imposed limitations on the relationship.
More importantly, the record does not support the trial court's "feeling" that the mother's relationship with Mary "is not proper and is confusing to the children ... [who] are developing resentment with regard to this relationship."
The father's expert witness, Dr. Baker, who evaluated the two older children, reported that David was "very much opposed" to his contact with Mary. Dr. Baker testified it was his "impression" that David had frequent contact with Mary but admitted that he did not ask David how often Mary visited in the mother's home. Laura did not mention Mary to Dr. Baker.
Dr. Baker testified that he had "some concern" about the mother's interaction with Mary, but he did not evaluate either parent and he did not state whether or in what way he would recommend that the mother's relationship with Mary be changed.
According to Dr. Baker, Laura and David had no decidedly negative feelings about their mother, but they were more excited about the possibility of moving into the father's large home than they were about staying in the mother's apartment. Dr. Baker did not think that the children, at ages 8 and 11, "could know or make value judgments as to who can support them the best." He recommended that they receive counseling, no matter which parent they lived with, but did not express an opinion as to whether the existing joint custody plan should be changed.
The father does not contend, and the record does not show, that the mother's relationship with Mary is immoral. The father has not shown that the mother violated the court-imposed limitations on the relationship, or that the children have been harmed by the friend's visits in the mother's home and disciplining of the son on one occasion. Although the mother began working outside the home after joint custody was awarded, the record shows that she provides the children with adequate supervision during the day and spends as much time with them as her work schedule permits. The changes in her circumstances since the joint custody decree have not been shown or suggested to be detrimental to the children and do not warrant removing the children from her custody. See and compare Everett v. Everett, supra; Manley v. Manley, 389 So.2d 454 (La.App. 2d Cir. 1980), writ denied, 395 So.2d 341 (La.1980); Fouchi v. Fouchi, 391 So.2d 1352 (La.App. 4th Cir.1980), writ denied, 396 So.2d 918 (La.1981).

OTHER EVIDENCE

Bergeron v. Bergeron, supra, recognizes that in some cases, modification of a considered custody decree may be in the child's best interest even if the moving party is unable to show that the present custody is harmful to the child, but requires the party seeking the change to prove by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages to the child. 492 So.2d at 1200.
The comparative beneficial and detrimental effects that may be caused by removing a child from a stable environment are also weighed in cases applying the "best interest" standard to claims for custody modification. See CC Arts. 146 K, 157. See also Johnston v. McCullough, 410 So.2d 1105 (La.1982), and Bailey v. Bailey, 527 So.2d 1030 (La.App. 2d Cir.1988), writ denied.
The father clearly has more regular work hours and a more stable home life *1285 than he had when he was on flight duty. He earns more money than the mother does and lives in a four-bedroom home with ample accommodations for the children. The children have a good relationship with their stepmother and stepbrother.
The children have lived with their mother since birth and have adequate accommodations in her three-bedroom apartment. The only evidence of possible emotional harm to them resulting from the mother's custody came from Dr. Baker, who felt that David and Laura were more withdrawn and insecure than he would like to see for children of their ages, even taking into account the trauma of the divorce itself. Dr. Baker was not asked how a change in custody might affect the children emotionally, and did not express an opinion for or against a change. His only recommendation was that the children should receive counseling, which he admitted was available in Shreveport as well as in the Washington, D.C. area. He attributed their desire to live with their father at least in part to their wish to live in a house rather than an apartment, and explained that they were not old enough to know or judge which parent could "support them the best."
A child's preference to live with one parent or the other is not, standing alone, sufficient to justify a change in custody. Johnston v. McCullough, supra. The factors that the father relies on to explain why the children wish to live with him, including his large home, his superior financial ability to provide for them, and their affection for him and their stepmother, are not legally sufficient to change custody absent a showing that the environment the mother provides for the children is inadequate. See Bailey v. Bailey, supra; Lingenfelter v. Lingenfelter, 384 So.2d 523 (La.App. 2d Cir.1980); Ezell v. Kelley, 513 So.2d 454 (La.App. 2d Cir.1987).

CONCLUSION
We recognize that the trial court's decision in custody matters is entitled to great weight and is to be disturbed on appeal only when there is a clear abuse of discretion. Cleeton v. Cleeton, 383 So.2d 1231, 1235 (La.1980) (on rehearing). This record, however, does not show that the physical, moral, or emotional environment provided by the mother was detrimental to or inadequate for the children, or that the benefits available to them in the father's home would justify removing them from the primary residential care of their mother, where they have been since birth. The changes in the circumstances of the father and mother since 1987, although not detrimental to the children, may suggest some modification of the joint custody plan but do not legally warrant a change to sole custody by the father.

DECREE
This record shows a clear abuse of the trial court's discretion. Accordingly, and at the father's cost, the judgment awarding sole custody to the father is reversed, the effect of which reinstates the 1987 joint custody decree.
REVERSED.